# IN THE SUPREME COURT OF IOWA

No. 06 / 06-1443

Filed May 2, 2008

**STATE OF IOWA,**

    Appellee,

vs.

**GUY EDWARD FREMONT,**

    Appellant.

---

Appeal from the Iowa District Court for Worth County, Jon S. Scoles, Paul W. Riffel, and Bryan H. McKinley, Judges.

Defendant appeals conviction based upon the admission of evidence seized pursuant to a warrant issued by a magistrate who was not neutral and detached. **REVERSED AND REMANDED.**

Mark C. Smith, State Appellate Defender, and Martha J. Lucey, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Elisabeth S. Reynoldson, Assistant Attorney General, and Jeffrey H. Greve, County Attorney, for appellee.

**APPEL**, **Justice**.

In this case, we consider whether the search and seizure provisions of the United States and Iowa Constitutions require the suppression of evidence obtained where a search warrant was approved by a magistrate who, at the time of the execution of the warrant, simultaneously represented a party in a family law proceeding adverse to one of the warrant's named parties. We hold under the facts of this case that the magistrate was not "neutral and detached" as required by the Fourth Amendment and that the doctrine of harmless error does not apply. As a result, the motion to suppress should have been granted. The conviction of the defendant, therefore, is vacated and the case remanded to the district court.

## I. Background Facts and Proceedings.

In August 2005, Mike and Amy Wilson contacted Worth County Deputy Sheriff Dan Fank regarding their granddaughter. The Wilsons told Fank that when they visited their granddaughter, the baby's clothing smelled of marijuana. Additionally, Amy told Fank that when the baby's mother, Destiny Fremont, visited the Casey's store where Amy worked, she exhibited bloodshot eyes and acted "goofy." When confronted about being stoned, Amy reported that Destiny merely looked away and giggled. Fank told the Wilsons that they should contact the Department of Human Services and report any further incidents to law enforcement.

The following month, Amy contacted another Worth County deputy sheriff, Jan Langenbau. Amy advised that after she and her husband picked up the child, they opened the baby's blanket and found a leafy substance they believed to be marijuana. Langenbau collected the substance. Tests later confirmed that it was indeed marijuana.

In January 2006, T.C. Simon contacted Fank. Simon was at the time dating Lacy Nelson, Destiny's sister, and had recently lived with Nelson, Destiny and their parents. Simon admitted that he had smoked marijuana at the residence. Simon additionally told Fank that the Fremonts periodically purchased marijuana, that everyone in the home smoked it, and that they possibly also used methamphetamines. Simon expressed concern about the small children who resided at the home.

Two weeks after receiving the report from Simon, Fank and Northwood Police Officer Jesse Luther removed a bag of garbage from the sidewalk in front of the Fremont residence. In the garbage, the officers discovered an envelope addressed to the defendant Guy Fremont, Destiny's father, numerous stems and seeds, and a used package of Zig-Zag rolling papers. The stems later tested positive as marijuana.

On January 19, 2006, Fank presented an application for a search warrant to Douglas Krull, a part-time magistrate. The application included an affidavit by Fank, a report by Langenbau, and photos of the items recovered from the garbage bag. Among other persons, Destiny Fremont was listed on the search warrant as residing in the home.

Krull immediately recognized Destiny's name. Destiny and Bryce Schnulle were the unmarried parents of the Wilsons' granddaughter. Krull, in his capacity as a private attorney, had previously filed a paternity, custody, and child support action on behalf of Schnulle against Destiny. Two months prior to the warrant application, Schnulle through Krull, sought temporary child support. The court denied the motion, and ordered Schnulle to pay temporary support. The matter was still pending at the time the warrant was issued.

Krull decided to sign the warrant even though he was aware of his representation adverse to Destiny. Krull reasoned that the evidence was

overwhelming, physical in nature, and did not require him to evaluate the credibility of witnesses. The search warrant was executed on the same day Krull signed the warrant.

The search produced substantial evidence against the adults living in the home. Upon entering, Fank immediately recognized the overwhelming smell of burnt marijuana. Searches conducted on the adults present produced additional marijuana and rolling papers. When Fank pulled Guy aside and asked if there was additional contraband in the house, Guy directed officers to two trays of marijuana in an upper cabinet in the kitchen. In addition, marijuana was seized from an upstairs bedroom and methamphetamine and marijuana paraphernalia were discovered, including pipes with residue in the room next to where small children were playing. Guy also admitted he sold marijuana, but only to make a life for his family.

In light of the evidence, the State charged Guy with possession of marijuana with intent to deliver, failure to affix a drug tax stamp, and child endangerment.

Guy filed a motion to suppress the evidence seized in the search, asserting that Krull was not a neutral and detached magistrate as required by Article I, section 8 of the Iowa Constitution and the Fourth Amendment of the United States Constitution. The district court held that because probable cause was so clearly established, no constitutional infirmity was present. Guy was later convicted of all charges. The defendant appealed.

## II. Standard of Review.

Constitutional claims are reviewed de novo. *State v. Freeman*, 705 N.W.2d 293, 297 (Iowa 2005). In an action involving a structural challenge to the validity of a warrant, the burden of proof rests with the

defendant. *Franks v. Delaware*, 438 U.S. 154, 156, 98 S. Ct. 2674, 2676, 57 L. Ed. 2d 667, 672 (1978).

**III.  Discussion on Merits.**

**A.  Background of Requirement of a "Neutral and Detached" Magistrate in Search and Seizure Context.**  The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const., amend IV.

The Iowa Constitution has a search and seizure provision with nearly identical language.  Iowa Const. art. I, § 8.  These two constitutional provisions are generally "deemed to be identical in scope, import, and purpose." *State v. Groff*, 323 N.W.2d 204, 207 (Iowa 1982). No party has suggested that the Iowa constitutional provision should be interpreted differently than its federal counterpart on the contested issues in this appeal and, as a result, we interpret the Iowa Constitution similarly to its federal counterpart. *In re Detention of Garren*, 620 N.W.2d 275, 280 n.1 (Iowa 2000) (refusing to deviate from federal analysis in considering state constitutional claim because appellant "ha[d] suggested no deficiency in the federal principles . . . nor ha[d] he offered an alternative test or guideline").

The second clause of the Fourth Amendment, known as the Warrants Clause, is silent on the question of who may issue a valid warrant.  As a result, while the language suggests an intent to limit the power of police to engage in searches and seizures that are unreasonable or not based on probable cause and to limit the scope of warrants

authorizing intrusions into private lives, there can be no resort to a textual analysis of the Fourth Amendment to provide guidance on the question of who may issue a valid warrant. Lloyd L. Weinreb, *Generalities of the Fourth Amendment,* 42 U. Chi. L. Rev. 47, 47 (1974).

The drafting history of the Fourth Amendment is also of little help. While James Madison's original draft of the Warrants Clause was directed solely at the substantive requirements for a valid warrant, the draft was changed by Congress to include the Reasonableness Clause. Tracey Maclin, *The Central Meaning of the Fourth Amendment,* 35 Wm. & Mary L. Rev. 197, 208–09 (1993). There is simply nothing of relevance on the question of magistrate qualifications that can be teased from this drafting history.

In light of the language and limited legislative history, it is not surprising that authorities have resorted to vague generalities in characterizing the commands of the Fourth Amendment. Leading Fourth Amendment scholars declare that the Fourth Amendment embodies "a spiritual concept" in the value of privacy and a "value judgment" about privacy and security in a free and open society. *See* Jacob W. Landynski, *Search and Seizure and the Supreme Court: A Study in Constitutional Interpretation* 47 (1966); Anthony Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn. L. Rev. 349, 403 (1974). These declarations, however, provide little specific guidance on how Fourth Amendment values should be implemented in the real world.

**B. United States Supreme Court Approach to Neutrality and Detachment of Magistrates Under the Fourth Amendment.**

1. *"Neutral and detached" magistrate.* Left with the broad language of the Fourth Amendment and the unilluminating historical context, the burden of translating the generalized constitutional

commands of the Fourth Amendment into a workable body of law has fallen on the United States Supreme Court. The first clear pronouncement by the United States Supreme Court that a warrant under the Fourth Amendment must be issued by a "neutral and detached" magistrate surfaced in *Johnson v. United States*, 333 U.S. 10, 68 S. Ct. 367, 92 L. Ed. 436 (1948). In *Johnson,* Justice Robert Jackson emphasized that the inferences drawn from evidence to determine whether probable cause existed to engage in a search must be made by "a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Id.* at 14, 68 S. Ct. at 369, 92 L. Ed. at 440. As originally formulated by Justice Jackson, the requirement of a "neutral and detached" magistrate was tied to the concept of separation of powers—the magistrate approving the warrant must not be an eager (or sullen) police apparatchik or agent. *Id.*

The requirement of a "neutral and detached" magistrate announced in *Johnson* has been subsequently repeated, usually as background dicta, in dozens of United States Supreme Court cases. In light of the Supreme Court's stated preference for searches based on warrants issued by magistrates upon a showing of probable cause, *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967), the inherently vague concept of probable cause, the ex parte nature of the proceeding, and limited appellate review of probable cause determinations only for abuse of discretion, academic commentators have stated that the securing of a warrant from a "neutral and detached" magistrate has evolved into the "centerpiece," "cornerstone," and "critical protection" of the Fourth Amendment. Silas J. Wasserstrom & Louis Michael Seidman, *The Fourth Amendment as Constitutional Theory*, 77

Geo. L.J. 19, 34 (1988) (centerpiece); Robert B. Mosteller, *Testing the Testimonial Concept and Exceptions to Confrontation: "A Little Child Shall Lead Them,"* 82 Ind. L.J. 917, 973 n.208 (2007) (cornerstone) [hereinafter Mosteller]; George R. Nock, *The Point of the Fourth Amendment and the Myth of Magisterial Discretion,* 23 Conn. L. Rev. 1, 21 (1990) (cornerstone).

2. *Separation of powers.* The *Johnson* case involved a question of the separation of power between the police seeking a warrant and the magistrate reviewing it for legal sufficiency. *Johnson,* 333 U.S. at 14, 68 S. Ct. at 369, 92 L. Ed. at 440. In addition to *Johnson,* three other United States Supreme Court cases have developed the neutral-and-detached-magistrate requirement in the separation of powers context. In *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971), the state attorney general issued a search warrant even though he was actively in charge of the investigation and was later to be the chief prosecutor at trial. 403 U.S. at 450, 91 S. Ct. at 2028, 29 L. Ed. 2d at 573. The Supreme Court held that "there could hardly be a more appropriate setting than this for a per se rule of disqualification rather than a case-by-case evaluation of all the circumstances." *Id.*

The notion of separation of powers was further explored in *Shadwick v. City of Tampa,* 407 U.S. 345, 92 S. Ct. 2119, 32 L. Ed. 2d 783 (1972). In this case, the Supreme Court held that a court clerk who was an employee of the judicial branch was sufficiently disassociated from the role of law enforcement to issue arrest warrants for violators of municipal ordinances. 407 U.S. at 350–51, 92 S. Ct. at 2123, 32 L. Ed. 2d at 789. The court noted that "[w]hatever else neutrality and detachment might entail, it is clear that they require severance and

disengagement from activities of law enforcement." *Id.* at 350, 92 S. Ct. at 2123, 32 L. Ed. 2d at 789.

Similarly, in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S. Ct. 2319, 60 L. Ed. 2d 920 (1979), a town justice signed a warrant to search an adult book store, and then accompanied police in order to make a case-by-case determination of obscenity. 442 U.S. at 321, 99 S. Ct. at 2322, 60 L. Ed. 2d at 925. The Supreme Court held that by becoming part of the prosecution team, the magistrate could not be considered neutral and detached for Fourth Amendment purposes. *Id.* at 327, 99 S. Ct. at 2325–26, 60 L. Ed. 2d at 929.

*Johnson, Coolidge, Lo-Ji Sales*, and *Shadwick* suggest that the warrant requirement reflects "a preference for one sort of government officer—a judge—over the far more competitively charged police officer" when it comes to making the discretionary decisions that authorize searches. *Mosteller*, 82 Ind. L.J. at 973 n.208. The issue posed by this case, however, is whether a constitutional attack may be mounted on the neutrality or detachment of a magistrate based on other grounds of bias not rooted in separation of powers concepts.

3. *Direct, personal, substantial, pecuniary interest.* In one case, the United States Supreme Court demonstrated a willingness to consider a constitutional challenge to the neutrality and detachment of a magistrate on grounds other than traditional separation of powers. In *Connally v. Georgia*, 429 U.S. 245, 97 S. Ct. 546, 50 L. Ed. 2d 444 (1977), the police sought and obtained a warrant to search a home for controlled substances from a justice of the peace. 429 U.S. at 246, 97 S. Ct. at 546, 50 L. Ed. 2d at 446. Under Georgia law, justices of the peace were not salaried, but were compensated five dollars for every warrant issued but nothing in cases where the warrant was denied. *Id.*

at 246, 97 S. Ct. at 546–47, 50 L. Ed. 2d at 446. In a per curiam opinion, the Supreme Court invalidated the warrant on the ground that the magistrate was not neutral and detached as required by the Fourth Amendment. *Id.* at 249–50, 97 S. Ct. at 549, 50 L. Ed. 2d at 448.

Although the compensation scheme in *Connally* could have been characterized as making the magistrate a paid agent of law enforcement and therefore violating separation-of-powers principles, the Supreme Court did not rely on a separation-of-powers analysis. Instead, the Supreme Court noted that the magistrate had " 'a direct, personal, substantial, pecuniary interest' " in his decision to issue the warrant. *Id.* at 250, 97 S. Ct. at 598, 50 L. Ed. 2d at 448 (quoting *Bennett v. Cottingham*, 290 F. Supp. 759, 762–63 (N.D. Ala. 1968)). This "direct, personal, substantial, pecuniary interest" had the potential of distorting the magistrate's judgment in a fashion that offended Fourth Amendment values. Arguably, *Connally* opened the door to an analysis of the neutral-and-detached-magistrate requirement that extends beyond ensuring that the magistrate is not an agent of the state or otherwise engaged in the prosecutorial process.

4. *Incorporation of due process principles.* Another important feature of *Connally* is its incorporation of due process principles into the analysis of the Fourth Amendment. Specifically, *Connally* relied primarily on the due process analysis provided in *Tumey v. Ohio*, 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749 (1927) and *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S. Ct. 80, 34 L. Ed. 2d 267 (1972) in resolving the Fourth Amendment question of whether a magistrate was "neutral and detached."

In *Tumey,* the court formulated a test of judicial impartiality for due process purposes. In language often quoted, the Supreme Court

noted that the appropriate due process inquiry was whether the facts revealed a situation

> which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused.

*Tumey*, 273 U.S. at 532, 47 S. Ct. at 444, 71 L. Ed. at 758.

The *Tumey* test was further applied by the Supreme Court in the case of *Ward*, 409 U.S. at 57, 93 S. Ct. at 80, 34 L. Ed. 2d at 267. In *Ward*, the Supreme Court held that an Ohio statute that authorized mayors to sit as judges with respect to ordinance violations and traffic offenses violated due process because a major portion of the village's income came from the fines, fees, and costs imposed in the mayor's court. 409 U.S. at 60, 93 S. Ct. at 83, 34 L. Ed. 2d at 271. The Supreme Court concluded that this structure put the mayor in a position that " 'might lead him not to hold the balance nice, clear, and true between the state and the accused. . . .' " *Id.* (quoting *Tumey*, 273 U.S. at 534, 47 S. Ct. at 444, 71 L. Ed. at 759). *But see Dugan v. Ohio*, 277 U.S. 61, 48 S. Ct. 439, 72 L. Ed. 784 (1928) (holding where mayor had only limited functions, the mayor's relationship to the finances and financial policy of the city was too remote to give rise to due process concerns when the mayor acted as a judge and imposed fines on offenders).

Significantly, the Supreme Court in *Connally* did not simply discuss *Tumey* and *Ward,* but expressly embraced the application of the due process reasoning in Fourth Amendment cases involving challenges to the neutrality and detachment of magistrates. The *Connally* court noted that the facts of its case were not precisely the same as in *Tumey* and *Ward,* but concluded that "the principle of those cases" is applicable

to the Georgia system for issuance of search warrants. *Connally*, 429 U.S. at 250, 97 S. Ct. at 548, 50 L. Ed. 2d at 448. In light of this unambiguous language, the Supreme Court has incorporated the *Tumey-Ward* due process principles into Fourth Amendment analysis. Thus, although the defendant has not expressly raised a due process challenge, his challenge to the magistrate's impartiality based on due process concepts is fully preserved by his Fourth Amendment attack.

At least one due process case decided by the United States Supreme Court subsequent to *Connally* suggests that certain grounds for due process attack (and by implication any attack on the neutrality and detachment of a magistrate under the Fourth Amendment), which do not involve direct pecuniary interest of judges, may be narrow. In *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813, 106 S. Ct. 1580, 89 L. Ed. 2d 823 (1986), the Supreme Court considered a case where Justice Embry of the Alabama Supreme Court joined in a five-four opinion related to the availability of a bad faith cause of action in Alabama when he simultaneously was a plaintiff in an action against an insurance company seeking to recover based upon a bad faith claim. 475 U.S. at 816–17, 106 S. Ct. at 1583, 89 L. Ed. 2d at 829. In *Aetna*, the Supreme Court rejected the notion that the general hostility of Justice Embry against insurance companies that were dilatory in paying claims was sufficient to raise a due process violation. *Id.* at 820, 106 S. Ct. at 1585, 89 L. Ed. 2d at 832. Noting that not all claims of judicial qualifications involving " 'kinship, personal bias, state policy, [ ] [or] remoteness of interest' " are constitutional in dimension, the court emphasized that such bias or prejudice would rise to offend due process only in the most extreme of cases. *Id.* at 820, 106 S. Ct. at 1584, 89 L. Ed. 2d at 831 (quoting *Tumey*, 273 U.S. at 523, 47 S. Ct. at 441, 71 L. Ed. 2d at 754).

The Supreme Court did, however, find a due process violation because Justice Embry had a "direct, personal, substantial, pecuniary interest" in the outcome of the case before the Alabama Supreme Court. That case would set binding precedent in the bad faith case wherein Embry was a named plaintiff. *Id.* at 822, 106 S. Ct. at 1586, 89 L. Ed. 2d at 833.

In an important concurring opinion, however, Justice Brennan suggested in *Aetna* that the Court did not state that nonpecuniary interests could not arise to a due process violation. *Id.* at 829, 106 S. Ct. at 1589, 89 L. Ed. 2d at 838 (Brennan, J., concurring). Justice Brennan noted that in *In re Murchison*, 349 U.S. 133, 75 S. Ct. 623, 99 L. Ed. 942 (1955), the Supreme Court held that due process disqualified a judge who presided over a proceeding alleging contempt of a grand jury in which the same judge was the grand jury's only member. *Aetna*, 475 U.S. at 830, 106 S. Ct. at 1580–90, 89 L. Ed. 2d at 838. As noted by Justice Brennan, the judge in *Murchison*, had no direct or indirect pecuniary interest, but due process was nonetheless violated because of the conflicting roles assumed by the judge. *Id.* Justice Brennan noted that nothing in the *Aetna* opinion was inconsistent with *Murchison's* assertion that the interests which trigger a due process problem "cannot be defined with precision." *Id.*

**C.** **Lower Court Application of Fourth Amendment Requirement of Neutral and Detached Magistrate Involving Nonpecuniary Interests.**

1. *Overview.* While the cases are relatively rare, several courts have implemented the *Connally* framework in nonpecuniary settings. For example, in *State v. Burnam*, 672 P.2d 1366, 1380 (Or. Ct. App. 1983), a state court found that a personal interest prevented a magistrate from being neutral and detached when the warrant related to the rape of his

clerk. In another case, *State v. Edman*, 915 A.2d 857, 867 (Conn. 2007), another state court found that where a former court employee had recently threatened to sue a judge over an employment dispute, that judge could not function as a "neutral and detached magistrate" regarding a search of the employee's residence. A result similar to *Edman* was reached in *People v. Lowenstein*, 325 N.W.2d 462, 467 (Mich. Ct. App. 1982), where a magistrate previously prosecuted the defendant and was sued by the defendant was held not be neutral and detached.

These decisions by implication recognize the holding of *Connally* that due process concepts apply to Fourth Amendment challenges to the neutrality and detachment of magistrates. These cases also appear consistent with the United States Supreme Court's due process holding in *Murchison* that constitutional challenges to the impartiality of a judge may include nonpecuniary interests that must be evaluated in the specific factual context of a given case.

The courts have been careful, however, to set clear limits to claims that nonpecuniary interests defeat magistrate neutrality and detachment under the Fourth Amendment. For example, mere past association or knowledge of a defendant is generally not deemed to give rise to a constitutional infirmity. As was colorfully stated in *United States v. Heffington*, 952 F.2d 275 (9th Cir. 1991),

> Assuming that an appearance of partiality may lurk in the fact that judges and police officers in rural counties often know more about local criminal recidivists than their more urban colleagues, we are not prepared to disqualify small town judges on demand.

952 F.2d at 279. Similarly, past legal representation either on behalf of or adverse to a defendant is not ordinarily grounds for attacking the neutrality or detachment of a magistrate. *United States v. Guthrie*, 184

Fed. App'x 804, 807 (10th Cir. 2006) (holding that there was no Fourth Amendment violation where magistrate represented, several years earlier, son of owner of private residence to be searched); *United States v. Outler*, 659 F.2d 1306, 1312 (5th Cir. 1981) (holding no nexus between magistrate's prior prosecution of the defendant and subsequent proceedings); *State v. Mandravelis*, 325 A.2d 794, 795 (N.H. 1974) (noting that before becoming a judge the magistrate represented the accused on several charges, some of which resulted in conviction, and had knowledge of defendant's problems with drugs when younger). Remote claims of bias also have little prospect of success in the Fourth Amendment context. *United States v. Czuprynski*, 46 F.3d 560, 564 (6th Cir. 1995) (holding that evidence of employment dispute thirteen years earlier too remote). The above cases generally stand for the proposition that there is no Fourth Amendment requirement for the perfect or best "neutral and detached magistrate." *Heffington*, 952 F.2d at 279–80.

The closest case to the facts presented here is *State v. Slaughter*, 315 S.E.2d 865 (Ga. 1984). In that case, a magistrate who issued a search warrant in a drug case was also the attorney of record in a civil case against the defendant. *Slaughter*, 315 S.E.2d at 866. After a productive search, the defendant was charged with drug offenses. *Id.* The defendant claimed that his arrest on criminal charges provided grounds for his impeachment in the civil case and hampered his ability to vigorously participate in his defense. *Id.*

In *Slaughter*, the Georgia Supreme Court rejected the challenge to the search warrant. *Id.* at 869–70. The court noted that the fact of representation adverse to the defendant alone might be sufficient to show that a magistrate is not neutral and detached *in some cases* it does not necessarily require disqualification in all cases. *Id.* The court

emphasized, however, that it was quite possible that the magistrate did not even recognize the name of the defendant when the search warrant was issued. *Id.* at 870.

2. *Role of canons of judicial ethics.* The defendant claims that Iowa Code of Judicial Ethics 3(D)(1) establishes the standard for determining whether a magistrate is "neutral and detached" under the Fourth Amendment. This canon provides that a judge should disqualify himself or herself in a proceeding if "the judge's impartiality might be reasonably questioned." *See State v. Mann,* 512 N.W.2d 528, 532 (Iowa 1994). The State challenges this approach, arguing that the demands of the Fourth Amendment are fundamentally different than the canon requirements.

Some cases have held that the canons of ethics define the Fourth Amendment standard for a neutral and detached magistrate. *Commonwealth v. Brandenburg,* 114 S.W.3d 830, 832 (Ky. 2003) (holding "appearance of impropriety" test is incorporated into Fourth Amendment). Other cases, however, have suggested that the judicial canons are not incorporated wholesale into Fourth Amendment analysis. *United States v. Murphy,* 768 F.2d 1518, 1540 (7th Cir. 1985).

We reject the wholesale incorporation of Canon 3(D)(1) for a number of reasons. The canons of judicial ethics are designed not to protect individual defendants, but to protect the judiciary from charges of partiality. *Id.* The canons of judicial ethics thus often extend further than what is constitutionally required. *Aetna,* 475 U.S. at 821, 106 S. Ct. at 1585, 89 L. Ed. 2d at 832 (noting most matters relating to judicial qualification do not rise to a constitutional level); *Fed. Trade Comm'n v. Cement Inst.,* 333 U.S. 683, 702, 68 S. Ct. 793, 804, 92 L. Ed. 1010, 1035 (1948) (same). A number of the canons of judicial ethics, particularly those involving "appearances of impropriety," are not bright-

line tests which are easy to apply in individual factual settings. The last thing that Fourth Amendment law needs is another amorphous test lacking in predictability.

Finally, the contours of what is constitutionally required are not subject to the vagaries of rulemaking in the various jurisdictions. The scope of constitutional protections does not depend upon whether a jurisdiction has adopted certain model codes of judicial ethics. We thus conclude that while ethical guidelines may be instructive, they are not determinative on the constitutional question of whether a particular magistrate is neutral and detached under the Fourth Amendment.

**D. Application of Fourth Amendment Principles.** In light of the above, we must now consider whether the facts of this case establish a Fourth Amendment violation. The magistrate in this case was simultaneously representing the putative father against one of the targets of the search in a child custody proceeding. A successful search of the home, which sought to find evidence of drug offenses, could make the position of the mother more difficult in the child custody matter and advance the position of the father.

The case is thus similar to *Ward*, where the mayor did not receive a direct benefit when he engaged in judicial acts adverse to defendants, but the city that the mayor served was benefited by the mayor's actions. *Ward*, 409 U.S. at 57, 93 S. Ct. at 80, 34 L. Ed. 2d at 267. Moreover, this case contrasts with situations where the magistrate was involved in *past* representations of parties affected by the warrant decision, and thus the decision could have no impact on the outcome of the prior proceedings or where a challenge is based upon the mere acquaintance of judge with the accused. *Guthrie*, 184 Fed. App'x. at 804; *Outler*, 659 F.2d at 1312; *Mandravelis*, 325 A.2d at 794.

We also believe this case is distinguishable from *Slaughter*, 315 S.E.2d at 865. Here, there is a clear nexus between the current representation and the issuance of a search warrant. The issuance of the warrant could lead to a drug charge against Destiny Fremont. A drug charge in a child custody dispute is a serious matter and goes to the core of the fundamental question in child custody matters—the best interests of the child. Further, unlike in *Slaughter,* the magistrate in this case was aware of his representation adverse to one of the accused.

Under the unusual circumstances of this case, we conclude that the magistrate had a nonpecuniary personal interest in the matter that objectively cast doubt on his ability to hold the balance, nice, clear, and true, between the state and the accused. *Tumey*, 273 U.S. at 532, 47 S. Ct. at 444, 71 L. Ed. at 758. A probable cause determination must be made by a person unfettered by other potentially conflicting professional commitments. *Cf. People v. Payne*, 381 N.W.2d 391, 395 (Mich. 1985) (holding that magistrate's status as a deputy sheriff rendered him incapable of satisfying the neutral-and-detached requirement). The magistrate's simultaneous and conflicting dual roles rendered him unable to meet the requirements of a neutral and detached magistrate under the Fourth Amendment. *Id.* As the court in *Tumey* emphasized, a situation where one person "occupies two practically and seriously inconsistent positions, one partisan and the other judicial, necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him." *Tumey*, 273 U.S. at 534, 47 S. Ct. at 445, 71 L. Ed. at 759.

We agree with the State that the defendant has made no showing of actual prejudice in this case. In *Tumey*, *Connally*, and *Murchison*, however, the Supreme Court did not require such a showing. These

cases stand for the proposition that some conflicts are just so fraught with danger that a showing of actual prejudice is not required. We hold that the facts in this case present such an occasion.

Because of this Fourth Amendment violation, the evidence seized as a result of the execution of the warrant is subject to suppression. *Wong Sun v. United States,* 371 U.S. 471, 484–85, 83 S. Ct. 407, 416, 9 L. Ed. 2d 441, 453 (1963); *State v. Leto,* 305 N.W.2d 482, 484 (Iowa 1981).

**E. Avoidance of Exclusionary Rule through Harmless Error.** The State urges that the district court was correct when it held that because there was ample probable cause for the warrant, any constitutional infirmities in its execution are irrelevant.

Even if we were to agree with the State that there were ample grounds to support a finding of probable cause based on the affidavit presented to the magistrate in this case, that is not the end of the matter. As noted by Justice Jackson in *Johnson,*

> [a]ny assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.

*Johnson,* 333 U.S. at 14, 68 S. Ct. at 369, 92 L. Ed. at 440. An invalid warrant is the equivalent of no warrant at all. *Coolidge,* 403 U.S. at 450–51, 91 S. Ct. at 2030, 29 L. Ed. 2d at 574. As a result, Justice Jackson's admonition is fully applicable to this case and harmless error analysis does not apply. *Cf. Chapman v. California,* 386 U.S. 18, 23 n.8, 87 S. Ct. 824, 828 n.8, 17 L. Ed. 2d 705, 710 n.8 (1967) (holding that harmless error rule does not apply to charge of a partial judge). The lack of a

neutral and detached magistrate is a structural defect that defeats any application of the harmless error doctrine.

**F.  Summary.**  We hold that when a magistrate approves an application for a search warrant at a time when the magistrate knows he or she is engaged in legal representation against a target of the search warrant in a child custody matter which could be impacted in favor of the magistrate's client if the search is successful, a violation of the Fourth Amendment requirement that a magistrate be neutral and detached occurs.  Further, the doctrine of harmless error has no application where a warrant is issued by a magistrate lacking the required neutrality and detachment.  We reach these conclusions under the Fourth Amendment of the United States Constitution and independently under Article I, section 8 of the Iowa Constitution.

We recognize that some may not regard this case as presenting an egregious violation of the Fourth Amendment.  As observed by Justice Bradley over one hundred years ago in the seminal Fourth Amendment case of *Boyd v. United States*, 116 U.S. 616, 6 S. Ct. 524, 29 L. Ed. 746 (1886), *abrogated on other grounds by Bellis v. United States*, 417 U.S. 85, 94 S. Ct. 2179, 40 L. Ed. 2d 678 (1974):

> It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely: by silent approaches and slight deviations from legal modes of procedure.  This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed.  A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as it is consisted more in sound than substance.  It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

*Boyd*, 116 U.S. at 635, 6 S. Ct. at 535, 29 L. Ed. at 752.

**IV. Conclusion.**

The ruling of the district court denying the motion to suppress is reversed and the conviction in this case is vacated. The case is remanded to the district court for further proceedings.

**REVERSED AND REMANDED.**

All justices concur except Streit, J., who takes no part.